United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RYAN KIME**, <br> Plaintiff, <br> v. <br> **ADVENTIST HEALTH CLEARLAKE HOSPITAL, INC., ET AL.**, <br> Defendants. | Case No. 16-cv-04502-YGR <br><br> **ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR SANCTIONS** <br><br> Re: Dkt. Nos. 55, 57 |

Plaintiff Ryan Kime, M.D., brings this action under the Emergency Medical Treatment and Active Labor Act ("EMTALA") to address claims which arise from alleged longstanding and systemic violations of EMTALA by defendant Adventist Health Clearlake Hospital (the "Hospital"). Plaintiff's complaint centers on his allegation that the Hospital summarily suspended him in August 2015 after his repeated complaints about the Hospital's EMTALA violations. Plaintiff also alleges violations of section 1278.5 of the California Health and Safety Code, and of his right to fair procedure under both California law and the Hospital's Medical Staff Bylaws. Defendants move to dismiss the amended complaint for failure to state a claim and for sanctions under section 1927. (Dkt. No. 55.) Defendants also bring an anti-SLAPP motion to strike the state law claims. (Dkt. No. 57.)

Having carefully considered the pleadings and arguments of the parties, and for the reasons set forth below, the Court hereby **GRANTS** the motion to dismiss and **DENIES** the motion for sanctions.[1] In light of the Court's decision, it declines to address the Anti-SLAPP motion.

---

[1] Defendants have submitted documents for judicial notice in connection with the motion. (Dkt. No. 56.) In light of plaintiff's non-opposition, the Court **GRANTS** defendants' request for judicial notice, but does not accept the truth of any matters asserted in the documents. The Court gives such documents their proper evidentiary weight. The Court also **GRANTS** plaintiff's unopposed Request for Judicial Notice. (Dkt. No. 69.) The Court may properly take judicial notice

## I. PROCEDURAL BACKGROUND

The Court heard argument on defendants' first motion to dismiss on December 13, 2016 and granted the motion. (Dkt. No. 48.) When instructing plaintiff's counsel regarding leave to amend its EMTALA claims, the Court warned plaintiff that it did not share plaintiff's view of the expansive nature of EMTALA, but nonetheless allowed leave to amend. Plaintiff filed his first amended complaint ("FAC") on January 13, 2017. (Dkt. No. 52.)

## II. FACTUAL BACKGROUND

The following recitation is derived from the FAC.

Plaintiff is an emergency medical physician with twelve years of experience in emergency medicine. (FAC ¶ 12.) From 2012–15, plaintiff practiced in the Hospital's Emergency Department ("ED"). (*Id.* at ¶¶ 2, 13.) Beginning in 2013, plaintiff began voicing concerns about the "systemic and recurring" problems at the Hospital, particularly regarding the overall capacity of the ED and its ability to handle high patient volume, as well as the ED's ability to transfer patients who required a higher level of care. (*Id.* at ¶¶ 20–22.) Specifically plaintiff reported that the Hospital had inadequate nurse staffing and poor quality nursing, insufficient backup resources and inadequate procedures when computers were not working, problems triaging patients, and problems making arrangements to transfer critically ill patients. (*Id.*) Without alleging further details, plaintiff "reported two cases as possible EMTALA violations" during a "monthly Emergency Department meeting, in or around July 9, 2014 . . . ." (*Id*. at ¶ 25.) In July 2015, he reported a "patient safety problem" after another hospital refused the Hospital's transfer of a critically ill patient, which he believed was an EMTALA violation. (*Id.* at ¶ 32.) He was later criticized for making this report to the Hospital. (*Id*.) Finally, plaintiff recounts several patient-specific incidents involving delays in treatment due to various difficulties in transferring the patients to other hospitals. (*Id.* at ¶¶ 22, 24, 31–34.) The FAC lacks any allegation that the Hospital refused to stabilize a patient prior to transfer.

---

of matters of public record, like the census data plaintiff submits, if the facts noticed are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b); *Intri-Plex Technologies, Inc. v. Crest Group, Inc.,* 499 F.3d 1048, 1052 (9th Cir. 2007).

According to the FAC, the ED's systemic problems resulted in a high number of patients who registered for emergency medical care, but then left without being seen ("LWBS"). (*Id*. at ¶ 28.)[2] Allegedly, the ED's systemic problems culminated on August 7, 2015, when the ED was incapacitated due to the Hospital's inability to respond adequately to a power outage. (*Id*. at ¶¶ 35–39.) As the only physician working in the ED that night, plaintiff "repeatedly urged" that the Hospital be placed on "diversion" status, so that ambulances would take all emergency patients to other hospitals. The Hospital declined to do so. (*Id*. at ¶¶ 35–37.)

Soon after the power outage, on August 13, 2015, plaintiff was "summarily" suspended based on apparent complaints of unprofessional behavior and patient abandonment. (*Id*. at ¶¶ 44–45.) Plaintiff claims he was not given an opportunity to defend himself, in violation of the Hospital's Bylaws and California law. (*Id.* at ¶¶ 45–47.) He also claims that defendants misrepresented that he had resigned his hospital privileges while under investigation, and issued negative reports to the Medical Board of California and the National Practitioners Data Bank on that basis. (*Id.* at ¶¶ 50–51.)

Plaintiff seeks damages for emotional distress resulting from "substandard and extremely stressful conditions" in which he was required to work at the Hospital (*id*. at ¶¶ 40, 60) and for the severe damage to his reputation and earning capacity (*id*. at ¶ 53–54).

## III. LEGAL FRAMEWORK

### A. Legal Standard

Pursuant to Federal Rule of civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

---

[2] Notably, the FAC lacks any allegations that plaintiff reported the specific problem of the LWBS patients.

3

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678–79. Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

## B. The Emergency Medical Treatment and Active Labor Act

EMTALA was enacted to combat "the specific problem of hospital emergency rooms refusing to treat patients who were uninsured or who could otherwise not pay for treatment." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001). Congress was concerned that emergency rooms were "either declin[ing] to provide treatment [to these patients] or transfer[ing] [these] patients in an unstable condition to other hospitals, thereby jeopardizing patients' health." *Id.* (citing H.R.Rep. No. 99–241, pt. I, at 27 (1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 605; *Jackson v. East Bay Hosp.l*, 246 F.3d 1248, 1254 (9th Cir.2001)). EMTALA did not, however, "create a national standard of care for hospitals" and "[t]he statute expressly contains a non-preemption provision for state remedies." *Id.* (citing *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1258 (9th Cir.1995); 42 U.S.C. § 1395dd(f)).

EMTALA imposes two duties on hospital emergency rooms that participate in the Medicare program: first, the hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002) (alteration in original) (quoting 42 U.S.C. § 1395dd(a); *Eberhardt,* 62 F.3d at 1255–56). Effectively, EMTALA creates a duty to "screen" patients. Second, "[i]f the hospital's medical staff determines that . . . an emergency medical condition [exists], then, except under certain circumstances . . . the staff must 'stabilize' the patient before transferring or discharging . . . ." *Id.* (citing 42 U.S.C. § 1395dd(b)(1); *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 992 (9th Cir. 2001)). This is the duty to "stabilize" patients.

"To help give bite to its policy objectives, EMTALA contains a pair of provisions allowing private persons the right to sue for damages." *Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013). First, EMTALA allows suits by "[a]ny individual who suffers personal

4

harm as a direct result of a participating hospital's violation of a requirement of this section . . . ." 42 U.S.C. § 1395dd(d)(2)(A). Second, EMTALA provides for whistleblowers. Thus, a "participating hospital may not penalize or take adverse action against [1] a qualified medical person . . . or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or [2] any hospital employee because the employee reports a violation of a requirement of this section." 42 U.S.C. § 1395dd(i).

## IV. DISCUSSION

The FAC fails to specify upon which of the two EMTALA provisions plaintiff seeks to proceed. However, the briefing on the Motion to Dismiss indicates that Count One arises from claims that the hospital violated its obligations under EMTALA and that plaintiff suffered personal harm as a direct result, pursuant to section 1395dd(d)(2)(A), and that Count Two is intended to allege EMTALA retaliation, pursuant to 1395dd(i). The Court addresses each.

### A. Count One: Private Right of Action for Personal Harm As a Direct Result of EMTALA Violation Under § 1395dd(d)(2)(A)

Pursuant to EMTALA's civil enforcement provision, "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A).

Plaintiff alleges that he is an "individual who suffer[ed] personal harm as a direct result" of the hospital's long-standing and systemic problems, which resulted in repeated EMTALA violations. Specifically, in the FAC, plaintiff adds allegations that he suffered emotional distress as a result of the "substandard and extremely stressful conditions" in which he was required to work at the hospital. (FAC at ¶¶ 40, 60.)

The Court previously found that plaintiff does not have standing to assert such a claim because this EMTALA provision applies to individual patients who are personally harmed by an EMTALA violation.[3] *See Pauly v. Stanford Hosp.*, No. 10-CV-5582-JF PSG, 2011 WL 1793387,

---

[3] This Court previously declined to follow *Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 580 (6th Cir. 2009) which presented a distinct fact pattern than alleged here.

5

at *4 (N.D. Cal. 2011) ("Congress's decision to extend a private right of action to 'any individual' properly may be understood as evidence of an intent to extend that right to each group of 'individual patients' described in the statute").

Plaintiff asks the Court to adopt a more expansive view of section 1395dd(d)(2)(A) and give physicians like plaintiff standing to sue when a hospital has violated EMTALA and the physician has suffered personal harm as a direct result. The Court declines. Such an interpretation would render section 1395dd(i)'s whistleblower protection mere surplusage, as any physician who experienced retaliation after reporting an EMTALA violation would already be able to bring suit under section 1395dd(d)(2)(A). *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (it is a "cardinal principle of statutory construction" that Congress's words, if at all possible, ought not be read as "superfluous, void, or insignificant").

Accordingly, the Court again finds that plaintiff does not have standing to bring a claim under section 1395dd(d)(2)(A) and **GRANTS** defendants' motion to dismiss Count One.

### B. Count Two: Retaliation for Reporting EMTALA Violation under § 1395dd(i)

Under EMTALA's whistleblower provision, a hospital "may not penalize or take adverse action . . . against any hospital employee because the employee reports a violation of a requirement of this section." 42 U.S.C. § 1395dd(i). Here, plaintiff alleges that he complained of many issues concerning safety and quality of care at the hospital. According to the FAC, plaintiff reported issues including the Hospital's generic failure to (1) screen patients in a timely matter, (2) stabilize in a timely manner before transferring and (3) provide appropriate services for patients that required a higher level of care.

The Court's analysis of the alleged complaints reveals that they cannot be reasonably construed as an EMTALA violation. That is, the complaints at issue, even if true, do not allege either a failure to screen patients for emergency medical conditions or transfers of patients that were not stabilized. Rather, while the conditions of which plaintiff complains could potentially lead to EMTALA violations, EMTALA's whistleblower provision only protects those who report "an *existing* EMTALA violation, not an *impending* one." *Genova*, 734 F.3d at 1099 (emphasis in original).

As discussed above, Dr. Kime alleges that he complained of a litany of issues but each concern hospital services that impacted quality of care. Reduced to their essence, Dr. Kime asserts four categories of violations. First, he alleges that the Hospital failed to employ adequate procedures in response to a power failure. (FAC at ¶ 2.) Second, it failed to provide *timely* screening which resulted in some patients that LWBS (*id.* at ¶¶ 27–32) and timely stabilization treatment. (*Id.* at ¶ 24.) Next, the Hospital transferred patients that needed a higher level of care. (*Id.* at ¶¶ 19, 22.) Finally, Dr. Kime makes a generalized allegation that during a monthly emergency department meeting, he "reported two cases as possible EMTALA violations." (*Id.* at ¶ 25.)

Regarding the first category (adequate procedures in response to a power failure), although this complaint could theoretically result in a future EMTALA violation, it does not constitute a violation in itself because it does not involve a failure to screen or stabilize.

With regard to the second category (failure to screen resulting in LWBS patients), Dr. Kime's allegations fail for two reasons. First, EMTALA specifically ties a hospital's screening obligations to the emergency department's capabilities by requiring "an appropriate medical screening examination *within the capability of the hospital's emergency department. . . .*" 42 U.S.C. § 1395dd(a). (Emphasis supplied.) Here, plaintiff does not allege facts supporting a plausible inference that the hospital's failure to screen patients in a timely matter was the result of anything other than the Hospital's limited capabilities. On the contrary, Dr. Kime characterizes the Hospital as a "small rural hospital with limited services," shoddy infrastructure, archaic information technology, a dearth of quality nurses, and severe resource constraints. (FAC at ¶¶ 19-21, 27.) By Dr. Kime's own admission, the Hospital had "problems with the capacity" to provide screening examinations." (*Id.* at ¶¶ 19, 20, 27.) Viewing the FAC in its entirety, Dr. Kime's allegations regarding the patients that LWBS do not allow the court to draw a "reasonable inference" that the Hospital failed to provide a screening "within the capability" of the ED. *See Ashcroft*, 556 U.S. at 678–79. Next, the FAC lacks allegations that plaintiff actually reported the issue of patients that LWBS. Instead, he merely claims they were "well documented and known." (*Id.* at ¶ 29.) These allegations are not sufficient.

With regard to the alleged failure to stabilize in a timely manner, the FAC does not actually allege that the hospital transferred "an individual that has not been stabilized." 42 U.S.C. § 1395dd(b). Rather, it merely provides that after a third-party hospital refused to admit a transfer patient, the patient was not provided stabilization treatment for several hours. By Dr. Kime's own admission, however, the patient was eventually stabilized before being transferred. (FAC at ¶ 24.) In short, Dr. Kime does not allege facts consistent with the dumping conduct that EMTALA prohibits. A third-party's refusal to accept a transfer patient, even if true, cannot reasonably be construed as an EMATALA violation attributable to the Hospital. Similarly, an alleged delay in stabilizing a patient before transfer is not an outright failure to stabilize, and thus cannot reasonably be construed as a violation.

The fourth category (refusal to transfer patients that needed a higher level of care) fails because this type of conduct is not dumping. *Genova*, 734 F.3d at 1098. Dr. Kime's generic allegation that he "reasonable believed" refusal to transfer of patients that needed a higher level of care to be an EMTALA is not sufficient. (FAC at ¶ 32.) *Genova* is instructive. There, plaintiff physician "didn't complain about patient *dumping* so much as about patient *hoarding." Genova*, 734 F.3d at 1098 (emphasis in original). The *Genova* court held that "EMTALA simply does not speak to [hoarding]" even though "it is easy to see how hoarding could lead to dumping and, with it, EMTALA violations." *Id*. Likewise, here, the Court acknowledges plaintiff's concerns and the importance of physicians reporting unsafe hospital conditions. However, the Court cannot find that EMTALA's whistleblower provision contemplates a cause of action for reporting conduct that, even if proven true, could not reasonable be construed as a violation.

The cases plaintiff cites do not compel a contrary analysis. In each of those cases, the alleged conduct, if proven true, would have amounted to a violation of EMTALA. *See Kaplan v. Blue Hill Mem'l Hosp.*, No. 1:14-CV-276-DBH, 2014 WL 7272846, at *5 (D. Me. 2014) (at least some of physician plaintiff's alleged reports could be reasonably construed as EMTALA violations); *Ritten v. Lapeer Reg'l Med. Ctr.*, 611 F. Supp. 2d 696, 715–16 (E.D. Mich. 2009) (EMTALA's whistleblower provision protected physician plaintiff who alleged retaliation based on refusal to transfer patient he reasonably believed was not stabilized, even if it was later proven that patient was, in fact, stabilized). By contrast, none of the alleged complaints here concerns either turning

away patients without screening them for an emergency condition, or transferring them before they were stabilized.

For instance, in *Kaplan*, plaintiff Dr. Mark Kaplan had reported that surgeons were "inappropriately authorizing the transfer of patients to other health facilities ("dumping"), in violation of EMTALA." *Id*. at *2. He alleged that he was instructed to "supplement a medical record and to conduct an examination of a patient under conditions that violate EMTALA." *Id.* Finally, plaintiff Michelle Kaplan not only reported "various practices that she believed to be in violation of EMTALA, or to present safety risks for patients," but "documented in patient charts between 200 and 300 separate EMTALA violations." (*Id*.) Moreover, the complaint there included an "itemized list of 17 types of alleged violations." *Id*. at *2, FN 3. The facts alleged by the *Kaplan* plaintiffs stand in stark contrast to the allegations in Dr. Kime's FAC. As discussed above, Dr. Kime alleges that he complained of a litany of issues but these concerned hospital services that impacted quality of care.

Finally, the Court turns to Dr. Kime's allegation that he "reported two cases as possible EMTALA violations" during a monthly ED meeting in or around July 9, 2014. (FAC at ¶ 25.) This allegation is deficient because it lacks specificity as to the facts underlying the alleged violations, and Dr. Kime's declaration reveals that this alleged violation involved yet another failure of a *third-party* hospital to accept transfer patients which, as discussed above, cannot reasonably be construed as an EMTALA violation. (Dkt. No. 58-3, Declaration of Ryan Kime, M.D. at ¶ 17, Exh. I (discussing improving transfer "response times").) Apart from the duty to stabilize patients before initiating a transfer, EMTALA imposes no obligation on hospitals to provide a threshold level of care for patients whose transfers are subsequently refused by a third-party hospital. Dr. Kime has not alleged that the Hospital failed to stabilize a patient prior to initiating transfer, and thus plaintiff's allegation cannot be reasonably construed to be an EMTALA violation.

Accordingly, the Court **GRANTS** defendants' motion to dismiss Count Two.

### C. State Law Claims

Because no remaining federal questions will remain as a result of this order, the Court declines to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), over the

remaining state law claims and the related anti-SLAPP motion. *See Choyce v. SF Bay Area Indep. Media Ctr.*, No. 13-CV-01842-JST, 2014 WL 2451122, at *6 (N.D. Cal. June 2, 2014) (finding that, where a federal court declines to exercise supplemental jurisdiction over state law claims, defendants have no presumptive right to have their anti-SLAPP motion heard).

Therefore, the Court **DENIES** the anti-SLAPP motion **WITHOUT PREJUDICE** towards defendants raising it in any future state-court proceeding.

### D. Sanctions

Defendants move for sanctions under section 1927. Pursuant to section 1927, any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions under section 1927 "must be supported by a finding of subjective bad faith . . . [which] is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996); *see also Cinquini v. Donohoe*, 1996 WL 79822, at *8 (N.D. Cal. 1996) ("An attorney becomes subject to § 1927 sanctions by acting recklessly or with indifference to the law . . . An award of sanctions under § 1927 requires a showing of intent to prosecute a claim that lacks a plausible legal or factual basis, or a showing of bad faith or reckless conduct." (internal citations and quotation marks omitted)).

Defendants here make no attempt to demonstrate bad faith, aside from arguing that plaintiff's amended complaint does not differ materially from the original complaint. *See Wages v. I.R.S.*, 915 F.2d 1230, 1235 (9th Cir. 1990) ("By attempting to file an amended complaint that did not materially differ from one which the district court had already concluded did not state a claim, and by continually moving for alterations in the district court's original judgment despite the court's clear unwillingness to change its mind, [plaintiff] evidenced bad faith in multiplying the proceedings in this case 'unreasonably and vexatiously.'"); *Boress v. Reynolds*, 2004 WL 1811193, *3 (N.D. Cal. 2004) ("Repeated filing of materially identical complaints despite an adverse judgment is evidence of bad faith.").

The Court finds plaintiff alleged some material differences between the original and amended complaint, such that bad faith is not evident. In particular, plaintiff's amended complaint includes additional allegations regarding ED's failure to screen patients who registered for care, but LWBS, and stabilize patients in a timely matter. Although the Court finds plaintiff's arguments ultimately unavailing, the record does not support a finding that the amended complaint was filed in bad faith, as required to award sanctions under section 1927.

Accordingly, the Court **DENIES** the motion for sanctions under section 1927.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion to dismiss and **DENIES** the motion for sanctions.

Further, the Court finds that given plaintiff's reliance on *Kaplan*, he was well aware of what was required to survive this motion to dismiss. Despite knowing the allegations required to survive a motion to dismiss, Dr. Kime's allegations fall short. Because the Court has already given plaintiff an opportunity to amend and warned plaintiff that the Court did not, as a matter of law, share his expansive view of EMTALA, the Court finds that further amendment would be futile and a waste of judicial and party resources. *See Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) (holding that a district court does not err in denying leave to amend where the amendment would be futile or where the amended complaint would be subject to dismissal).

Therefore dismissal is **GRANTED WITH PREJUDICE**. The Clerk shall close the file.

This Order terminates Docket Numbers 55 and 57.

**IT IS SO ORDERED.**

Dated: May 22, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

11